Our counsel will be arguing. If you could step up to the left turn and identify yourselves. Hi, good morning, Justices. My name is Yvette Loisan and I'm here for the plaintiff. Good morning, Justices. My name is Krista Frick. I'm here for Advocate and a myriad of health providers. Good morning, Justices. Amy Lipkis on behalf of Defendants, Appellees, Dr. Jones and Renaissance Medical Group. Okay, as you know, the panel has read your briefs and we're familiar with the authorities and the record. And I believe we will interrupt you with questions, not to be rude, but in an effort to make sure we make the most of our time together. We've allocated 20 minutes per side and an additional five minutes for rebuttal for the appellant. In terms of our appellee, how do you wish to divide your time? I think I want to use the 13 minutes and then leave the rest to my court. Okay, so 13 and 7. Great, okay. Well, with that we'll get started. Counsel for the appellee can have a seat. Ms. Loisan, whenever you're ready. Thank you. May it please the Court, Justices, Counsel. Your Honor, Gabriel Lopez was alive for a total of 52 days. For 30% of that time, his father, the plaintiff, was unable to care for and exercise his parental rights for his child. Instead, the person who was caring for that child, making the child's medical decisions, and otherwise posing as the child's parent, was Clarissa Figueroa, a woman who had cut that baby out of his mother's womb and murdered his mother. Yolani Lopez-Colonga, our plaintiff, was deprived of 30% of his child's life the first 16 days because the defendants, who should have known that Clarissa Figueroa could not be his mother for several reasons, not the least of which being that she had medical history demonstrating that she had a tubal ligation that was part of records that Advocate Christ Hospital had in their possession. They ignored those glaring facts, and they allowed her to continue to pose as his parent. Can I ask you, this case is here, of course, as a certified question, Rule 308. And so what facts, if any, are we even to consider, right? We don't review the complaint. We don't review even the trial court's order. We're limited to simply the questions that were certified, right? Your Honor, you are limited to the legal question pursuant to a 308 appeal. However, in order to adequately assess the legal question, it's the plaintiff's position that this court must consider the entirety of the facts and circumstances before it, primarily because this is a novel issue of law that is largely dependent on the circumstances presented If it's a fact-dependent question, then perhaps leave to appeal was improperly granted, right? Because we don't know what the facts are. We know what the facts are that are alleged, but by definition, that just seems incongruous with the analysis we typically do under Rule 308. I agree, Your Honor, that it's a different situation than what is normally presented to this court, pursuant to a 308 appeal. However, I would point out to Your Honor that in this case, the trial judge, Sua Sponte, issued those Rule 308 questions. Neither party asked for them, although we're certainly glad to be here. In the court, Sua Sponte, I would assert, issued those 308 questions because this was an extremely close call on a legal issue that is novel to Illinois law. I do think that in order to understand the legal questions, it's important for this court to consider the factual context of this case. However, I certainly do recognize that in order for this court to make the legal determination that this court will be tethered to case law, and it would be my position that under Illinois law, based on the questions that are presented to you, you are still free to make a determination that the IAED case that is before you is a viable cause of action, cognizable under Illinois law. Counsel, speaking of the facts, and so the facts in this case are that this horrible, horrible crime occurred to this child's mother, and the infant is rushed to the hospital in a separate ambulance and then taken to a neonatal unit and a neonatal doctor, and the team in the emergency room begins trying to save this baby's life. That's one fact. And there's some other characters going on with the criminal purported bomb. And that's the facts of the case. Basically, really condensed down, short, they took the two different ambulances, and this person said that they were the mom, or maybe I don't even know if they said they were the mom. They came in with a placenta. I said they had given birth, and then the medical teams began doing the emergency care. That's it, right? In a nutshell, yes, I'll just flesh that out a little bit, Judge. The mom was taken by a separate ambulance to Christ Hospital. She presented indicating that she had birthed the baby at home. And there was no sign of blood. The blood was stable. The bleeding was stable. There was no lacerations. No blood on the underwear of the legs. She was admitted to the hospital for three days and was under the care of the Advocate Christ Medical Center. Over here. Over here. And the baby's over. Correct. But the baby was in the hospital and was being cared for by personnel from Advocate Christ, their children's hospital, for several days. And during that time, the criminal continued to make that child's medical decisions and pose as that child's parent. Now, recognizing that this is a 308 appeal, I would assert to you that the amount of knowledge and information that the doctors on the child's side of the house had regarding this mother, her medical history, anything that could have contributed to their knowledge of how to take care of this baby, we don't know the answer to that. And that is why granting the motion to dismiss in this case, I would assert, was improper, because there are questions of fact that should be allowed to proceed through the discovery process so that ultimately decisions can be made on this case with all of the facts in hand. But it seems as though in the brief that there's allegations that the treating physicians on the child's side had this knowledge about the mother's tubal ligation and all this history regarding the mother. Am I reading that right in the brief, in your briefs? That's certainly the allegation, Your Honor. And I would just point out to say that this is a motion to dismiss. This case was granted at the motion to dismiss stage, so these are allegations. What we do know, based on the medical record that is in the court's possession, is that information containing the mother's medical history related to the tubal ligation, as well as some other medical procedures she had, were documented in advocates' records. And to the extent that the pediatric side of the house had access to those records as employees of Advocate Christ Hospital is a question of fact that we would be able to suss out in the event that this case was not subject to dismissal at this stage. I'm puzzled because on the 308 appeal, we never, absent a final judgment, we don't review whether or not a trial court erred in dismissing a claim or a defendant, right? That's not what we do on a 308. Judge, I would say that if we are turning to the actual legal questions that are before you, Your Honor, there are purely legal questions that this court can decide. And so when we talk about the issues presented for review by the trial court, the first issue is, can a cause of action for IAD be stated against a defendant allegedly engaging in the outrageous conduct toward a plaintiff who is unknown to the defendant and who is not present at the time of the purportedly outrageous conduct? And that question, I would submit, is taken directly from the restatement of torts, the second restatement, section 46, which mimics that same exact language. The legal question before you, Your Honor, in question one, involves a third-party claim for IAED. And it is plaintiff's position that in that third-party claim, the requirements pursuant to the restatement are, A, that a member of a person's immediate family who is present at the time, whether or not such distress results in bodily harm, has to be the subject of the IAED. That's A. And B is, to any other person who is present at the time, if such distress results in bodily harm. In this case... So those are limiting principles. Almost peculiar to this court in terms of courts and commentators recognizing the need to reign in potential liability. Right. That's true, Your Honor, but a couple points to be made on that question. First and foremost, from the inception of IAED law in this state, in Naram v. Izzo, one of the instructions that the Supreme Court gave courts is that where outrageous conduct is present, courts should not be fearful of allowing IAED claims to continue based on a concern that they're opening the floodgates. That's first and foremost. And that sentiment, that line of reasoning, has permeated Illinois jurisprudence and IAED cases all along. Secondly, I would point out to Your Honor that in order to properly assess whether a claim for IAED is viable in the legal context, there has to be some factual assessment as to whether or not it is truly extreme and outrageous conduct. This court isn't being asked to make the determination of whether the cause of action should ultimately result in a recovery for the plaintiff, but you do have to consider whether this constitutes extreme and outrageous conduct that would shock the conscience. I don't want to assume that from the question. Isn't that a given? I think that is a given, Your Honor, but that's where the factual issues that we're talking about come into play. I would also assert that when you are considering the third-party claim pursuant to the restatement in the court's question, you cannot ignore the caveat that courts have acknowledged in the restatement specifically noted, and that is that there are some situations in which conduct is so extreme and outrageous that the factors that are considered in the restatement and are otherwise considered by courts, particularly that a person be known and or present, that those factors can sometimes be loosened in order to allow a claim to proceed. In this case, I would also assert that we can look at this from a different perspective, and the perspective that we should look at this case comes from question two, and it's this. In this set of circumstances, this is not necessarily a third-party claim contemplated by the restatement. This court could just as easily find that the plaintiff in this case, who was known insofar as advocate had every reason to know, they should have known. Now, when you say should have, this shouldn't bother me in your brief, because when I read should have, that sounds like negligence to me, not an intentional tool. I should have been more careful on the subway and not bumped into Justice Navarro this morning. That's negligence, right? As opposed to, oh, there's Navarro. Let me go bump into him. That's intentional, George. That's bad. So I would point, Your Honor, to Flatwater Law on IIED claims, and it's that the actor knows that there is at least a high probability that his conduct will cause severe emotional distress. So I agree with you that should have known is probably sloppy language on my part, but the IIED jurisprudence does contemplate a scenario where the actor knows that there's a high probability that his conduct will cause severe emotional distress. It doesn't necessarily mean that you have to know the object of the, whether it's the individual you're ultimately damaging. And I would assert that here they didn't know the object that there was an individual that they were ultimately damaging because there was no way they could not have known that Clarissa Figueroa was not this child's mother. They had every single reason to know. They knew it was in their medical records. It was evident by her presentation to the emergency room with no sign that she had birthed a baby. She was 46 years old. She had no blood, no lacerations, and her medical records demonstrated a tubal ligation. And that's out of circumstances, Your Honors. I would assert to you that Christ Hospital absolutely knew that she was not this baby's parent, and some parent had to be out there. Now, they did not know that that parent was Giovanni Colunga Lopez. They did not know that. But they knew that there were parents out there that were not Clarissa Figueroa. I feel like there's a difference where in that funeral home case, that Red Cross case, where the director knew and actually I think in that case had met with or there was some contact with the other family member. So they should have known that the person who was claiming or wanted the deceased cremated, the director should have known this other individual was out there that didn't want that disposition of the body. In this instance, this is very different, right? There's no contact. There's no way for them to know the father in this instance. I would absolutely disagree with that, Your Honor, and here's why. In the Red Cross case, the facts demonstrated that the person who actually had one-on-one personal contact with the funeral home was the ex-wife who did not have authority to make decisions on what to do with that, with the deceased's remains. However, she signed a document using the name Ronald Ricoche of the child of the decedent who did have authority to do that. So to the extent that the court made the determination that the funeral home should have known, it wasn't based on personal contact with Ronald Ricoche or any of the decedent's children. It was based on the fact that she had assigned someone else's name to possess those remains and then dispose of them as she chose. I would say that under that factual scenario, which is accurate, that this case is very akin to Ricoche because in this set of circumstances, Advocate Christ, just like that funeral home, they didn't have a concrete person in front of them saying, heads up, I'm the father. They didn't have that. Just like that wasn't happening at the funeral home. But they had every reason to know, just like that funeral director did, that the person who was claiming to be this baby's parent was not. And I would submit to you that Ricoche is directly on point. It's analogous, certainly, and on point with the facts of this case. I would also draw this Court's attention to Doe v. Montessori v. Lake Forest. I know you have read the briefs and you're familiar with the case law. But I think that that case is particularly significant for this reason. In that case, the Court wasn't considering intentional affliction of emotional distress based on what happened to the child. That child had been sexually abused at school. What they were considering was the cause of action based on the parent's own suffering that ultimately they alleged was the result of a cover-up of sorts related to what happened to their child. And that case is very significant because in that case, Illinois law makes a really important distinction. And they say this, that parents or people under Illinois law, and particularly parents because of Illinois public policy on how important that parent-child relationship is, that they are free to bring a cause of action for IIED when they're bringing that cause of action based on the distress that was directly put upon them by the defendant. In that case, the employee of that school who sexually abused that child knew that those parents existed. But I would assert to you that this is no different of a situation because Advocate Christ Hospital knew that Clarissa Figueroa was not that baby's parent. But you have this different, I mean, in the bill case, there's action. There's this act by the agent of the Montessori school that's very different than what's alleged here, which is the inaction by Advocate Christ. I agree with you, Your Honor, and that brings me back to rehash. And I would say that Illinois law also provides you guidance on this issue because here, in our case, this was not Advocate Christ Hospital making a mistake. They made a volitional decision to ignore the glaring facts that were presented to them, that were right in front of them, medical records that they had access to, a mother who came in bearing no signs of having actually had a baby. I think it's extremely important to point out at this juncture that we're not talking about a mother who walked into a grocery store and said, hey, this is my baby. The people at Advocate Christ Hospital, it is their job to take care of mothers who have birthed children. If they can't tell the difference between a mother who has birthed a child and one who has not, there's a significant concern there. And I would assert to Your Honor that in this set of circumstances, this is very akin to rehash, where, yes, you could characterize this as inaction, but I would say that the more appropriate characterization would be a volitional decision to ignore glaring facts that were right in front of them, that would have demonstrated that she was not this child's parent and all they had to do was pick up the phone and call the police as mandatory reporters. They do that all the time. In the funeral home case in Rekosh, the court found that there was a viable cause of action for IAED, where the funeral home director did not notice or otherwise chose to ignore that June Parks, the ex-wife, signed the name of a child who had authority over the remains who was not present. Counsel, your time is ticking down, but I do have one final question, and for me, at least, my colleagues may have additional questions. The second question arises related to an alternative holding that the trial court made. If we were to answer the first question, no, is it even appropriate for us to reach the second question? Yes, Your Honor, I believe that it is, and I think that that is why in framing this argument for you today, I talked to you about first that third-party IAED that's tethered to the restatement. I would say that the second question focuses on this scenario, the Rekosh scenario, if you will, that we were just discussing with Justice Navarro. That second question is more of a first-party IAED question, where we are saying that in this case, advocates' conduct in volitionally ignoring, willfully ignoring glaring facts right in front of them, where they knew that this could not be this baby's parent, that they caused direct and intentional infliction of emotional distress on the plaintiff. That takes it out of the context of the first question of whether they were known, unknown, present, not present. That's a third-party context, and that falls within the rubric of analysis of the restatement and what we would assert to be the caveat that permits courts under the restatement in that third-party context to nevertheless allow an IAED claim to continue, even if those factors that the restatement sets forth, which by way of the caveat, they make clearer suggestions, because IAED law is universally recognized throughout all states, and particularly in Illinois, is an area of the law that constantly grows and evolves based on the presentations of conduct before the court. Counsel, is it your belief that the proper, because again, I'm concerned about whether this is just negligence, the failure to do something that you believe they should have done, as opposed to an intentional act, totally. The advocate, with the treatment of a mom, they should have looked at her medical records. What about the emergency care that was provided to the infant? Do you believe that they should have delayed until they verified the identity of the parent or disobeyed their hypocritical oath to try to save the life of the child? Absolutely not, Your Honor. And I want to be clear that what Advocate did in order to save this baby, frankly, is commendable. They kept this baby alive for 52 days when he was born under dire circumstances. But that does not negate the fact that even on the pediatric side of the house, they were interacting with this mother not for a day, not just when she brought him into the ER. It was days and days and days and days. And throughout that time, they had every opportunity to obtain information about the mother. Now, whether or not they considered the mother's medical history, her prenatal history, which we know none existed, whether they considered the fact that she had other medical issues in her background. So you acknowledge that immediately that the emergency care, the first contact with that infant, there was no duty to do any further investigation as to parentage because their duty was to the child. But you believe that later as they went forth, they should have ceased receiving instruction from the putative mother. I believe that as they went forth, they had a duty to follow up on the glaring facts that were in front of them and the information that was in front of them and they arguably had access to, given that they were all under the advocate umbrella to ensure that the person who was making this child's medical decisions were in fact the child's parent. And I would just assert to your honors that that may seem, as I stand here and say it to you today, a reach. But I would assert to you that it's not. And here's why. Babies, infants, and hospitals have to be protected, not only medically, but to ensure that the adults who are taking care of them are the proper people. That's why when you bring a child in, they're checking bracelets, they're making sure that no other adult comes in and it's the guns with that child. There are many obligations that hospitals have to ensure that children who cannot advocate or speak for themselves are paired with the right parent. This is not new to advocate. And in this case, the fact that advocate abdicated that responsibility with information in front of them that should certainly have let them know that this was not the child's parents does amount to intentional infliction of emotional distress because they knew that there were other parents out there. And there can be no question, there's no question, that the amount of extreme emotional distress that Mr. Kalunga experienced, not knowing where his child was, and missing, more importantly, missing such a significant amount of time in his child's life, is extreme. It's outrageous. It's beyond all bounds of decency. And it's not the kind of conduct that, in a civilized society, the law should be willing to countenance. Thank you, counsel. Thank you, Ms. Lison. Thank you. Ms. Craig, whenever you're ready. May it please the Court, counsel, justices. This case, it's tragic. And, in fact, just two days ago was four years since this awful event occurred. We are here before this Court today on a 308 question, and I do agree with the Court in the sense that the only facts that are relevant to today's questions are whether or not the plaintiff was present when the alleged conduct occurred and whether or not the plaintiff was known to the defendants. Well, what of counsel's point that when you're reading these cases ineditably, these factors overlap. So when you're measuring outrageousness of conduct, it necessarily informs intent. And how in the world can you make those assessments, those legal assessments, without facts? I think that some facts can certainly be considered here. Whether or not defendant's conduct was outrageous and conforms with the restatement of facts, I think that is a question of fact that would have to be decided by the circuit court, by a jury in this case. But the issue when we're talking about facts and the allegations that are being made, they are allegations of negligence. Whether the defendants knew or should have known what was in Clarissa Figueroa's historical records, if they failed to look, because there is no evidence that any provider saw this in her records. And if that's an allegation of negligence, then plaintiff can bring this as a negligence claim. The other issue is when it comes to the outrageous conduct and what they knew or should have known, it's important to remember that EMS and the CPD went to the scene of Clarissa Figueroa's home when the ambulance was called. Both were present. Both went into the home because it's just protocol. Both EMS and the CPD came to the hospital. In fact, the CPD spoke to Clarissa Figueroa in the hospital making sure, okay, you're good now. When those professionals who are trained to find suspicious activity or perhaps murderous activity, they didn't come to the hospital and say, we have some suspicions here, let's look. I guess I'm missing that as part of the facts that we were presented with in the briefs. All this Chicago interaction and EMS interaction. Okay. And I apologize if that is not part of the record on appeal. It's certainly part of the information that the counsels all have. Right. And I guess it goes to what Justice Mitchell is saying. So much of this is so fact-dependent, and so we're considered this legal issue and it's so intricately intertwined with the egregious act of the criminal actors. Yes. I mean, there's no question. Outrageous? Yes. Those actions are outrageous. And it's kind of being pushed down to the defendants, and we're trying to distinguish those actions. Precisely. And I would say that Plaintiff certainly has a claim for intentional infliction of emotional distress against Clarissa Figueroa and Peter Bobak. There's no question. They knew that they weren't the parents. They knew that Marlon was pregnant with a baby. They knew that Marlon was a father to baby Lopez. They knew all that. So there is the intentional infliction of emotional distress. Where I think this line breaks and where the line has to be drawn at some point is to try to bring that claim against the hospital. And while I understand that Plaintiff wants to bring up a lot of facts to encourage and to have this court believe that the hospital absolutely knew without question that Clarissa Figueroa could never have been the mother of this baby, Clarissa Figueroa appeared at the hospital by way of ambulance, a separate ambulance from the baby. She had a complete placenta. And the reason that's important is because once a complete placenta is delivered, there is no reason to do a full pelvic exam on a mom who just gave their vaginal birth. In fact, the physicians will say, nothing in the vagina for 14 days. Well, that's a fact I didn't know, but it seems to be far outside of it. I'm struggling with this idea that we're not to consider the complaint. We're not even reviewing whether or not the trial judge made the correct decision. We're to answer these questions and send them back to the trial court, and then the trial court will do with them whatever she deems appropriate. Right? And, Justice, that's why I want to focus on the only questions that would be relevant here are those that are part and parcel of the 308 questions. Judge Kathy Flanagan said, there is no claim. Illinois law does not permit a claim for IIED where the plaintiff was not present. This is not a third-party action. Flanagan is claiming a first-party action against himself. The baby Lopez was not a victim of injury from the hospital. There are no allegations that the hospital injured baby Lopez. The only victim that's being claimed here is Plaintiff. He's claiming that outrageous conduct that was done not to baby Lopez, not to his son, that caused him emotional distress. That's a first-party claim. In third-party claims, there is another victim, like the husband and wife claims. Those are different. So we know Illinois law does not provide a claim where the plaintiff is not present for the alleged outrageous conduct. We also know that Illinois law does not provide for or allow a claim where the plaintiff is unknown. One of the, based upon, it was unknown to the defendant. Let me, maybe I'm confused because there were a lot of cases cited and I've read a lot of cases. I thought in the direct claim that the plaintiff did not need to be present. In all claims, both in Illinois and all Illinois claims require that the plaintiff be present. The ones that did not require presence was the one involving hostages, where they kind of went outside of the line a little bit. That's a third-party claim. That is a third-party claim. I would direct you to the restatement, right? Restatement 46, section 1. It says, One, by extremely outrageous conduct, intentionally or recklessly causes severe emotional distress to another, is subject to liability for such emotional distress and bodily harm to the results from it for such bodily harm. It's not until section 2 where we get down to a third-party claim where presence seems to be a limiting factor, right? And that, I may be updating myself, but when I was in law school, my torts professor used the example of the Kennedy assassination. If you didn't, if, could ordinary Americans watching this, seeing the assassination, an outrageous, horrific act, could they possibly bring a claim? And the answer would be, no, they couldn't bring a third-party claim, because, well, one, they weren't related and they weren't present. And so, no. That's one way the tort's limited. For there to be a first-party claim, he would necessarily have to be present because the alleged outrageous conduct would have to have been directed against him. They would have to know he existed. And respectfully, contrary to plaintiff's argument, there was no way that advocate and those health care providers who are not trained detectives, who are not trained police officers, would have the duty, never mind the experience, to begin an investigation. HIPAA would prevent the NICU physicians from going into the mother's file records. That's not even permitted. When we're talking about, in fact, I think the comment you're speaking of is where the court, the restatement does make clear that where extreme and outrageous conduct is directed, they talk about a limitation may be justified by the practical necessity of drawing a line somewhere. Since a number of persons who may suffer emotional distress at the news of the assassination of a president would be so numerous. And what plaintiff is asking the court here to do is to expand Illinois law to say, you don't need to be present and you don't need to be known to the defendant who is alleged to have performed, conducted the outrageous conduct. There is no Illinois law that allows for a plaintiff not to be present and not to be known. There is no such law in Illinois that permits that for an IAED claim. In fact, there is no Illinois law in the country that allows both not to be present. Some are one, some are the other, and some are the cases where there is the hostage situation where they speak about an immediate family member with no bodily injury, and they can bring that claim. Or if it's somebody else that was present at the time, they can bring the claim, but they have to have bodily injury at the time. It's a practical record question about the claim. And I was focused on the question, so I didn't commit the complaint. Are there any claims against the medical providers that survived the trial court's ruling? No. There are no allegations against the medical providers other than what they knew or should have known, which we maintain those are claims of negligence. There were 33 claims in the complaint. They weren't all against the medical providers because otherwise we'd have a final judgment and we'd be reviewing an ordinary appeal. There were some claims against the criminals. There are, more so in a factual way because they were defaulted. Clarissa Figueroa was named a defendant. She was defaulted. So there are certainly some claims against the criminals. But I'm not here discussing the criminals today, and by all means, I don't mean anything that I say today to indicate that this wasn't a horrible, tragic, horrendous event. But the hospital was provided with a baby in extremis who they had to care for. They were provided with a woman who was obese, who had a full placenta, who they did find blood in her vagina. It was stable bleeding. There were no lacerations, but to the court, as it were, not all vaginal births end in vaginal lacerations. And you reported she was the mother who had a boyfriend with her, or he claimed to be a husband, who said, I'm the father. And the daughter was also present and said, yes, mom had this baby at home. If, turning this around, the hospital now has a policy that says, wait, you had a baby at home? I don't know. We're going to have to do some DNA samples and separate you from this baby. And they turn out that's wrong? That is a claim of intentional infliction of emotional distress against the hospital. Because medical records are digital now, very electronic. At the point that someone noted in the emergency room that she did not have lacerations, that she had stable blood flow, at the point that then she was, I guess, treated. I don't even know what they were treating her for for three days. But at some point, was there not a burden to just check her medical records before you began to treat her? And if that burden exists, if that duty exists, and they fail to do it, that's negligence. That's not intentional infliction of emotional distress. And certainly that would be negligence against Clarissa Figueroa. I'm not even sure that plaintiff would have a claim for the negligence that was conducted against a patient. When we're talking a little bit about Judge Drikas, the claim, the case with the funeral home, I think it's important to note that the funeral director both witnessed the ex-spouse's forgery on the paper and stated, I knew that wasn't the son. I knew this woman wasn't his son. So when he did that, he was a part of this. He knew the son existed. He knew that this was a forgery. There was nothing like that in this case. When Clarissa Figueroa showed up, there was nothing that indicated to them outwardly that this wasn't her baby, but rather that she killed someone and took the baby from her. The second that the CPD came and started speaking to the medical providers, the NICU physician took protective custody of baby Lopez. The CPD, and I know this is in the record, said, don't say anything. We're going to start an investigation. And they did. Let's not just say, Counsel, that there are instances, right, where someone comes to the hospital with a child in distress, not distress, that the hospital is going to reach out to the police right after that, the second they walk in the door, because of whatever that situation is. I know we're getting tied into the facts again, but there are situations where the hospital is going to reach out right as soon as someone enters the hospital, right? There are. And they're required to do so. Absolutely, as mandated reporters. For child abuse, suspected sexual abuse, if that child comes in and they look like they've been beaten, absolutely, they need to reach out. If that child comes in and that child makes any indication that the child was sexually abused, they are mandated reporters. So there's not an allegation of sexual abuse, but there's an allegation, I mean, clearly if the child is presenting in distress, this is a situation, if we're going to talk about an outrageous situation or concerning situation, a child in this situation is that, this is that situation. The child that presented to EMS, right, to EMS and the CPD on the scene, was a child that was reported to be precipitously born, so very quickly born, in the home. The full placenta was present, and the baby just was not responsive. Now, unfortunately, babies even born in hospitals sometimes are born not responsive. So the presence of the mom coming in with the baby saying, my baby's not responsive, would not be an instant red flag of, she beat this baby. Why would she bring it in? And there's no signs, indications that the baby was beaten or otherwise abused. It was simply a newborn baby with a complete placenta attached that needed medical care and that was provided. Advocates' care of baby Lopez enabled Plaintiff to spend 30 days with his son. Had they not worked as tirelessly as they had, he never would have known his son. Plaintiff admits, I didn't know where my baby was, I didn't know where my son was. It wasn't that he knew they were there. This is not a case where an advocate denied him access to his baby. They simply didn't know. I have a question, a legal question again, similar to what I asked Mr. Weisen. And it's this. If we answer the first question in the negative, is it even appropriate for us to go to the second question? Because the second question at that point, it becomes almost an advisory opinion. We're answering a hypothetical. It wouldn't do anything to materially advance the litigation, because the first question essentially would be consistent with what the trial court has already done. In my position and set forth in my brief, it is our position that it is moot. If this court, we believe both should be found in the negative. If this court finds the first question in the negative, which we believe it should, then there is no reason to even consider the second question. All right. Thank you. Ms. Lucas, whenever you're ready. Thank you. May it please the court, counsel, justices. I want to first just briefly touch on the fact that with respect to the standard of review for addressing certified questions, for the judicial economy and to the benefit of not having to go through a second appeal, there is a purpose behind the facts being assessed in addition to addressing just the certified questions at issue. And I touched on this more in the brief with respect to the standard of review. But I did just want to touch on that since obviously it was something that was just discussed. Ultimately, we are here because of a situation that Clarissa Figueroa created. The conduct that she used during the course of this hospitalization and what transpired before is the reason that Mr. Lopez experienced distress. Dr. Jones, my client, the baby doctor, she doesn't see patients over the age of two. Plaintiff has conceded that my client, Dr. Jones, never provided any type of medical care to Clarissa Figueroa. She doesn't go to the labor and delivery department to provide any care and treatment. She remains at the children's hospital in the NICU. Is it your suggestion that we could answer the certified questions differently for your client versus advocate? I think that it's a more attenuated argument by plaintiff against Dr. Jones specifically because Dr. Jones is solely treating this baby. But additionally, Dr. Jones is the person that took protective custody of this child before Clarissa Figueroa was ever arrested, before the baby had ever even been genetically tested or DNA sampling was gathered. She took a risk and literally risked her career for purposes of the best interest of the child. But she did so after the police had informed her that she was under investigation or that this was not, there was some indication that the police had given her information, right? She didn't do this on a flyer. She didn't know until the police investigated and provided the information. And literally, that was when she took protective custody to protect this baby's life and give Mr. Lopez, who she did not yet know existed, an opportunity to meet his child and spend another month of time with his child. But for Dr. Jones, Mr. Lopez would have never been able to meet his baby. But she didn't contact the police, right? The police contacted her. The police, this evidence I don't believe is in the brief specifically, but the police specifically were investigating at the hospital. Dr. Jones heard about it and contacted them. What I will say to your, what I will say to the court is this. With respect to Dr. Jones, she went out on a limb. If this had turned out the other way, where Clarissa Figueroa had actually been the mother, Dr. Jones would absolutely be sued for intentional infliction of emotional distress along with plenty of other claims, I'm sure. There was no arrest of Figueroa. There was no DNA testing done when she took protective custody of that baby. And that does not, that's commendable. That does not negate, minimize any of the allegations on plaintiffs, that plaintiffs are making, however, because of what she did at that point. And as my colleague said, based on consultation with the Chicago Police Department who were investigating this, and that's wonderful. But the horrendous nature of the action that preceded her care is what brings us here. And whether or not there was a volitional ignorance of the fact that this was not the child's parent. Yes, and specifically, I bring up this point to you because the plaintiff appellant has provided a statement to you indicating that Mr. Lopez was only able to spend a specific amount of time with his child and did not see the child for 30% of the child's life. Notably, Mr. Lopez also continued the care and treatment at Advocate Christ with Dr. Jones and the providers of Renaissance Medical Group after he got there. So there's no issue with respect to the baby. What I will, what I do want to make sure I address before the court is the appellants make arguments in both briefs indicating that, number one, Figueroa held herself out, along with Peter Bobak, as the parents of this baby throughout this entire hospitalization. It's undisputed, obviously, that Dr. Jones never provided medical care to Clarissa. And consequently, the complaint's allegations, just in looking at the second amended complaint, indicating that we knew, defendants knew, unknown persons knew, that Figueroa could not be the mother is merely a conclusion at law without facts alleged to support it. And plaintiff goes on in, plaintiff appellant goes on in... I hate to interrupt, but I just, this conversation is so fact intensive that we're not reviewing whether or not a complaint states cause of action. We're answering specific legal questions under existing Illinois law. And we're not, we're not to do it in light of the complaint. We're, the first question we're asked, we're told to assume outrageous conduct. And we're asked whether there's a presence requirement, and whether, in a situation where the plaintiff's unknown to the defendant. Those are the two legal, that's it. There's nothing, who cares about the facts? They don't matter. And then question two, it's similar. The two legal requirements, can you commit the tort through inaction for non-reasons as opposed to non-reasons? That's it. The facts don't matter, do they? And respectfully, I do believe that some of these facts play a role here. Because they distinguish... Well, that's the sure way to deny a Rule 308 application in the first instance. So, the reason that I feel that facts do come into play is because it's how you distinguish this case from the case law that exists. Or how you show that it's analogous. Rule 308 is not a vehicle to take a plenary appeal from a final judgment of the merits. We don't review whether or not a trial judge correctly granted a motion to dismiss until we get a final judgment. We're just answering these very narrow questions. If I may, to the second question that the court certified pursuant to 308. Plaintiff Apollon admits in their briefings that there's no way that defendant Jones could have known of Figueroa's murderous conduct. And goes on to state specifically that there's no guarantee that even based on the information defendants had, that disclosing that information would have unveiled criminal conduct. The Girardi v. Lanson case is exactly that. The defendants there, it involved a situation with a child getting sexually assaulted by the bus driver. And the parents of the child sued the bus driver as well as the school district and the bus company. Because they didn't investigate further based on this driver who was apparently seen hugging the child multiple times. And also was seen parked in odd spots where he should not have been. And the first district specifically held in that case that it was not, first of all, viable for the parents to bring an IIED claim because the injury occurred to the child and not to the parents. They were not present at the time of the sexual assaults. But more importantly, from the standpoint of the second question that we're here to discuss today, it was a failure to act. They had no idea that their failure to investigate would lead to criminal conduct or to the results of criminal action. Likewise, we are in the same scenario here with Lopez because ultimately a failure to act, even if you assume the fact that defendants knew to be true, which I can't say we should be assuming because it's denied, but even if you were to assume that to be true, you're still in this factual predicament with respect to a failure to act being negligent and not an IIED. How do you answer the Doe case? I know there are a couple of different Doe cases, but we're talking about the Doe case where the mother tells the police officer that there is a rapist in the house with her daughter. That was an inaction case. Respectfully, I disagree. I think there was action. That was a situation where an intruder went into the home, sexually assaulted the mother. The mother escaped. The children were left inside the home with the intruder after just having assaulted the mother sexually. People heard the mother's screams. 911 was called. Police officers show up. An officer, I believe his name was Horkoff specifically, started degrading the mother with his speech. Despite the fact that he knew she was a sexual assault victim, he proceeded to ask her why she would have left the apartment when her children were still in it with the intruder and basically dismissed her as being hysterical, as alleged in the complaint. Furthermore, he then refused, despite being actively requested to do something about this, he refused to knock down the door claiming that he didn't want to be responsible for a property damage situation. Notably in that case, the other four officers who were also present at the scene but who did not actually interact at all with the plaintiff were found to not be able to sustain an IIED claim against because the same action had not been affirmatively taken. They were found to be just, it was a failure to act. It was a failure to just agree with Officer Horkoff's order to not destroy the door. But they had not actually taken an affirmative action of some kind against the plaintiff. So that case is distinguishable. And frankly, the cases that are cited by plaintiffs with respect to the second question specifically, essentially all involve some type of cover-up or some type of fraudulent concealment when you break them down and look at why the court permitted, in certain scenarios, an IIED claim to go forward based on any type of action. But the action was always a concealment. It was always something more than just a failure to act, which would be equatable to negligence. Thank you. Thank you, Your Honor. Ms. Wiesen? Thank you. Focusing solely on law, solely on law. The question that is asked first by the court, can a cause of action for IIED be stated against a defendant when they are unknown and not present? There is not a single case cited in the entire litany of cases that we cited and the defendants cited that says these words. The person has to be present. They have to be known. There's no case that says that. The only thing that says that is the restatement. But the restatement provides a caveat, an acknowledgment, a legal acknowledgment that in certain circumstances, you don't have to adhere to those rules because the conduct is so extreme and so outrageous that the law has to permit a case to go forward. Those are third-party claims. The restatement is talking about third-party claims. And I would assert to Your Honors that you can answer that first question, yes, because there is nothing in the law that tells you that the answer is no other than, arguably, the restatement factors which leave open a caveat for you. Pure issue of law, no question of fact, your answer can be yes. If you say no to that, if you say, no, this is not a third-party claim, this is something else, then purely on issues of law, you can answer yes to the second question. And here's why. Because there is no case in Illinois law or, frankly, anywhere else in the country that I've been able to find that tells you that a volitional act of doing nothing does not support an IIED claim. You have not read a case. We have not cited a case that tells you that. No, because it's an intentional tort. It's assumed, right? It is assumed, but, Your Honor, I would call your attention to the case law because the answer to question number two can be yes, pursuant to the case law. And I'm going to call you back to the cases that we've already talked about, Rekosch and Dover v. Montessori. Those cases both demonstrate to you that when a person's act of doing nothing, when the funeral director's act of saying, sure, go ahead and sign some guy's name who isn't here, go ahead and sign his name, I'm not going to pay attention to it, I'm not going to reach out to him, I'm not going to do anything, I'm going to hand you this guy's remains and I'm going to let you do whatever you want with them. That act of doing nothing was sufficient for that claim of IIED to go past the motion to dismiss stage. I'm sorry. What action would the defendants have taken to determine who the father was? If the Garoa isn't going to give him, and the newborn can't, the newborn can't be its own advocate, so what action would they take? The action they take all the time, judges, mandatory reporters. They should have picked up the phone and they should have called the police and they should have said, we have a woman here who claims to have precipitously birthed a child at home. She is 46 years old. There's no indication she birthed a baby. And we have medical records demonstrating that she has had a tumor ligation. That's what they should have done. And again, we're tying into the facts, but at least the defendants would say that the police were there. But they weren't there on day 1 or 2 or 3 or 4 or 5 or 6 or 7 or 8 or 9 or 10 or 11 or 12. They were there 13 days later. And respectfully, counsel provided facts to your honor that aren't in the record. That's exactly why this case should not be dismissed at the summary dismissal stage. I think the reason why your honors are wrestling so hard with separating facts from law here is because this is not a case that should be dismissed at the first stage. There is so much information that the court doesn't have that we don't have, and that's why Illinois law has been clear since Nearum v. Izzo in 1961, I think. Don't quote me on that, but I think I'm right. From the get-go of IIED law in Illinois, courts have said, don't close the gate out of fear of opening the floodgates. Let cases progress so you can make determinations of whether or not plaintiffs who've been emotionally damaged are able to bring cognizant claims. In this case, Illinois law gives you an opportunity based on Rekosch, based on Doe v. Montessori, and based on Doe v. Calumet City, which I would just emphasize to this court is a glaring example of nonfeasance being the basis of an IIED claim. Yes, yes, the mother in that case had been previously sexually assaulted. Yes, they spoke to her verbally in a way that was inappropriate. None of that rises to the level of outrageous conduct. What was outrageous in that case, Your Honors, is the fact that that police officer stood there and allowed a child to get raped inside, not knowing that the child was going to get raped, not only knowing that making the decision that he was going to do nothing because he was concerned that he could get sued for criminal damage to property. So not to sound like a broken record, but in answering a 308 question, we're supposed to answer yes or no, and yet if it's so fact-dependent, the answer would have to be, well, it depends. We're not allowed to answer a 308 question. Judge, respectfully, I disagree with your assessment of that, and here's why. You can answer the first question, as I previously indicated, without considering a single fact. You can answer that question yes, and you can answer that question yes because the restatement provides you with the caveat, and there's other case law from other jurisdictions that tells you that that caveat can be appropriately applied. And I'm going to direct your attention to Broberg v. Carnival, which is the case where husband and wife, wife goes on a carnival cruise, drinks too much, falls overboard. Husband learns of it on the news. Nobody contacts him. Carnival didn't know that husband. He wasn't present, and the court said this was so outrageous. That conduct was so extreme and outrageous that this case should be allowed to proceed past dismissal. Another case in a similar vein is the Witt case, and that case is out of the Connecticut court. It's cited in our brief. In that case, a couple had stored ovarian tissue in the hopes of having a child together. It was disposed of by someone at the facility, and the court determined that that was sufficient to create a cause of action for IIED under that third-person restatement animal because there was, while they didn't personally know this couple, the person who disposed of the remains, there's no facts that they personally knew the couple. They weren't present at that time. The conduct was so outrageous and egregious, it was allowed to proceed on a legal basis. The second question, as I indicated to you before, Judge, you can absolutely answer that question yes on purely legal grounds because I lost my case. Ricoch and Doe versus Montessori, both of those cases tell you that you can. Those are first-person direct IIED cases, and I would assert to you that in both of those cases, it was volitional, willful decisions to ignore the ability to act that put those plaintiffs in a position where their claim could proceed. Your Honors, just to sum up, I would say to you that if you ignore all these facts and you follow Illinois precedent and you answer these questions on purely legal grounds, you can answer yes to question number one, pursuant to the caveat in the restatement in the case law provided. You can answer yes to question two, based on Ricoch and Doe. And overall, Your Honors, this case is a matter of Illinois public policy, should be allowed to proceed in the same vein as the Illinois Supreme Court has contemplated from the very inception of this cause of action because this conduct was so extreme and outrageous that plaintiffs should be able to have his day in court. Thank you. Thank you. Thank you to all of our counselors today. You've given us a lot to think about. The case will be taken under advisement, and a written disposition will be issued before the court.